## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**JEREMY B. WAGNER,**

     **Plaintiff,**

**vs.**                      **Case No.  1:17cv93-MW/CAS**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's applications for a period of disability and Disability Insurance Benefits (DIB) pursuant to Title II of the Social Security Act (Act) and Supplemental Security Income (SSI) pursuant to Title XVI of the Act.  After consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History

On October 2, 2013, Plaintiff, Jeremy B. Wagner, filed applications for SSI and DIB, respectively, alleging disability beginning June 1, 1988 (age one and a half) based on seizure and bipolar disorders; speech and language impaired; depression, learning disabilities, ADHD; motor skill-apraxia; reading problems; and seizure disorder ADHD bipolar speech language skill-apraxia.  Tr. 12, 168-75, 208, 222.[1, 2]

Plaintiff's applications were denied initially on February 26, 2014, Tr. 12, 97-98, 127-34, and upon reconsideration on May 8, 2014.  Tr. 12, 125-26, 142-48.  On July 10, 2015, Plaintiff's representative requested the ALJ to issue a record decision without hearing.  Tr. 165-67.  On July 21, 2014, Plaintiff requested a hearing.  Tr. 12, 32-33, 155-56.

On July 16, 2015, ALJ Stephen C. Calvarese held a video hearing.  The hearing exhibits were accepted without objection.  Tr. 36.  Plaintiff appeared in Gainesville, Florida, and testified.  Tr. 37-56. Plaintiff's mother

---

[1]  Citations to the transcript/administrative record, ECF Nos. 10 and 11, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

[2]  The Administrative Law Judge (ALJ) determined that Plaintiff would not be entitled to DIB until January 1, 2010.  Tr. 12-13, 184.  He further determined that Plaintiff's "certified earnings record shows he has acquired sufficient quarters of coverage to remain insured through December 31, 2015.  Thus, [Plaintiff] must establish a disability on or before that date in order to be entitled to" DIB.  *Id.*  The ALJ also noted that SSI "is not payable prior to the month following the month in which the application was filed," here October 2, 2013.  *Id.*  Nevertheless, the ALJ noted that he "considered the complete medical history."  *Id.*

also testified, in part, that there has never been a period of time that Plaintiff was capable of living on his own without her assistance. She explained the nature and extent of her daily assistance and Plaintiff's activities, including special classes taken by Plaintiff since kindergarten. Tr. 58-62. The ALJ presided over the video hearing from Jacksonville, Florida. Tr.12, 34-71. Robert N. Strader, an impartial vocational expert (VE), testified during the hearing. Tr. 12, 41-42, 62-69, 158 (Resume), 294 (vocational expert comments/past work summary). N. Albert Bacharach, Jr., an attorney, represented Plaintiff. Tr. 12, 34-37, 152-54. The ALJ gave Plaintiff's counsel time to file a brief. Tr. 70.

On August 7, 2015, the ALJ entered a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from January 1, 2010, through the date of the decision. Tr. 12-26.

On September 20, 2015, Plaintiff requested review of the ALJ's decision and filed a one-page brief. Tr. 7-8, 295-96 (Exhibit 19E). On February 13, 2017, the Appeals Council considered the reasons Plaintiff disagreed with the ALJ's decision set forth in the brief submitted by Plaintiff's attorney and concluded "that this information does not provide a basis for changing the [ALJ's] decision." Tr. 1-6. The Appeals Council

denied Plaintiff's request for review of the ALJ's decision making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On April 14, 2017, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision. ECF No. 1. The parties filed memoranda of law, ECF Nos. 15, 16, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings:

1. "The claimant meets the insured status requirements of the Social Security Act through December 31, 2015." Tr. 14.

2. "The claimant has not engaged in substantial gainful activity [SGA] since January 1, 2010, the date first insured." *Id.* The ALJ noted that Plaintiff worked after the disability onset date but it did not rise to the level of SGA. *Id.* Nevertheless, the ALJ considered Plaintiff's certified earnings report from 2007 through 2012 and although the "earnings do not constitute disqualifying [SGA], this work activity evidences a perceived ability and willingness to work." Tr. 15.

3. "The claimant has the following severe impairments: neuro-developmental delay/cognitive disorder, attention deficit disorder, mood disorder, and impulse control disorder." Tr. 15. The ALJ considered Plaintiff's physical impairments including medical records that indicate Plaintiff had seizures at 15 and 18 and the last seizure at 24 months old. *Id.* The ALJ noted that a DDS physician opined that this impairment was nonsevere and that Plaintiff "did not testify to limitations as a result of his seizure disorder. He continues to engage in a wide variety of activities including driving and working out with very heavy weights.

Accordingly, the undersigned finds the claimant's seizure disorder imposes no more than minimal limitations on his ability to perform basic work activity and is nonsevere." *Id.*

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," including the criteria of Listings 12.02, 12.04, and 12.05. Tr. 15. The ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders known as the "paragraph B" criteria ("paragraph D" criteria of listing 12.05) and determined that Plaintiff had *mild* restriction in activities of daily living; *moderate* difficulties in social functioning and in concentration, persistence, or pace; and *no* episodes of decompensation, which have been of extended duration.[3] Tr. 16.

---

[3] The ALJ made additional findings regarding Plaintiff's daily activities when determining his RFC. Tr. 19. Relevant to this matter, the ALJ determined:

> In social functioning, the claimant has moderate difficulties. The claimant testified he has difficulties controlling his anger. He stated he lost three jobs due to his anger. However, he later admitted he lost his job at Publix because he skipped a lot of days at work to be with his girlfriend. He was also caught texting on the phone. (Exhibit 7-F). Despite his alleged difficulties with anger, there is no indication this has interfered with his college courses. In addition, he completed training to be a massage therapist. At the hearing, the claimant was able to interact appropriately and participate in a meaningful fashion. The record does not contain evidence of a history of altercations with people outside of his family, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. There is no indication the claimant is unable to maintain appropriate social relationships on a limited basis.

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The record shows the claimant required extra academic services due to a cognitive disorder and attention problems. He currently receives extra time to take tests on his college examinations. However, there is no indication the claimant is unable to maintain attention and concentration sufficiently long enough to complete the tasks commonly found in unskilled work. The claimant testified he is able to play video games for long periods of time and follow the plots of television programs. In addition, he is able to study and pass his classes. The claimant also described an extensive workout regimen, again suggesting a greater level of persistence and concentration than alleged.

The ALJ also considered the criteria of listing 12.05, paragraphs A through C and stated:

> Turning back to listing 12.05, the requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. In this case, these requirements are not met because the claimant has a high level of adaptive functioning and he was capable of participating in standardized testing. (Exhibit 1-F).
>
> As for the "paragraph B" criteria, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less. The claimant's IQ scores are not less than 59. Furthermore, his work history and adaptive functioning are at or above borderline IQ levels.
>
> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. In May of 1991, the claimant received a full scale IQ score of 71 on the Wechsler Preschool and Primary Scale of Intelligence Revised. His composite score on the Stanford-Binet Intelligence Scale was 77. In April of 1995 when the claimant was 8 years old, his full scale IQ score was 60 on the Wechsler Intelligence Scale for Children- 3rd Edition (WISC). (Exhibit 1-F/115). This placed him in the mildly Mentally Deficient range of intellectual functioning. It was noted he stayed up late the night before testing and his sleepiness may have influenced his ability to

---

Tr. 16. Although not dispositive, the ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms. 20 C.F.R. § 404.1529(c)(3)(i); Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987). But see Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

provide his best performance. In contrast to this testing, when administered the Stanford-Binet Intelligence Scale-Fourth Edition three months later in August of 1995, the claimant's composite score of 80 fell within the low average range. (Exhibit 1-F/72).

Although the claimant did have an IQ score that was 60 when he was eight years old, three months later, IQ testing placed him in the low average range of intellectual functioning with a score of 80. With the exception of his score on the WISC, which was taken when he was sleepy, the claimant's IQ scores are continually above 70. This is consistent with his progress throughout high school, his work history, and his ability to attend college classes. School records show the additional assistance and his individualized education program (IEP) helped him and by the time he graduated, he was enrolled in 94 percent regular classes, attending occupational therapy one time per week for 30 minutes and speech/language therapy two times per week for 30 minutes. (Exhibit 9-F). The claimant was able to participate in college courses, though he did need extra time on tests. The claimant lives alone in a condo that he owns. He is able to drive and care for his dog. The claimant does not have deficits of adaptive functioning consistent with mental retardation.

Tr. 17-18.

5. "[T]he claimant has the residual functional capacity [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant has a poor ability to read, write, and use numbers. He reads at a fourth grade level. The claimant is capable of understanding and remembering simple instructions and work-like procedures. Is limited to simple, routine tasks. The claimant is able to relate adequately with others in the workplace on a superficial level. He will perform best in an environment that does not require extensive social interaction. The claimant is capable of occasional, brief, superficial interaction involving the public, coworkers, and supervisors. Due to moderate restrictions in the ability to react to changes in the work setting, the

claimant can avoid hazards in the work setting but there should be no abrupt changes, only gradually introduced changes.  Tr. 18.

6. "The claimant does not have past relevant work."  Tr. 25.  The ALJ noted: "Although not performed at substantial gainful activity levels, the vocational expert testified the claimant has past work as a bagger and cleaner."  *Id*.

7. The claimant was 22 years old, which is defined as a younger individual age 18-49, on the date first insured.  *Id*.  He has a limited education and is able to communicate in English.  Transferability of job skills is not an issue because the claimant does not have past relevant work.  *Id*.  (Plaintiff was 28 years old at the time of the ALJ's decision.  Tr. 26, 168.)

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform."  Tr. 25.  The ALJ noted that Plaintiff's ability to perform work at all exertional levels has been compromised by nonexertional limitations.  To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and RFC.  The vocational expert identified several representative occupations such as Dishwasher, medium exertional level, SVP of 2, and unskilled; Garbage Collector, heavy exertional level, SVP of 1, and unskilled; and Bottle Packer, light exertional level, SVP of 2, and unskilled.[4]  Tr. 26, 64-66.  Plaintiff argues that the ALJ erred at

---

[4]  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  A Specific Vocational Preparation (SVP) of 1 means "short demonstration only."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month."  *Id*.  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id*.  Unskilled work corresponds to an SVP of 1 and 2.  SSR 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding

step 5 by finding that he is capable of performing work in the national economy.  ECF No. 25 at 24-29.

9. "The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2010, through the date of this decision." *Id.*; *see supra* at n.2.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial

---

appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 404.1567(c).  "Heavy work involves lifting no more than 100 pounds of time with frequent lifting or carrying of objects weighing up to 50 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 404.1567(d).

evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002)

(citations omitted).[5]

"In making an initial determination of disability, the examiner must

consider four factors: '(1) objective medical facts or clinical findings; (2)

diagnosis of examining physicians; (3) subjective evidence of pain and

disability as testified to by the claimant and corroborated by [other

observers, including family members], and (4) the claimant's age,

education, and work history.'" <u>Bloodsworth</u>, 703 F.2d at 1240 (citations

omitted). A disability is defined as a physical or mental impairment of such

severity that the claimant is not only unable to do past relevant work, "but

cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national

economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage

in any substantial gainful activity by reason of any medically determinable

---

[5] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

physical or mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous period of not
less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509
(duration requirement).[6] Both the "impairment" and the "inability" must be
expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212
(2002). In addition, an individual is entitled to DIB if he or she is under a
disability prior to the expiration of his or her insured status. *See* 42 U.S.C.
§ 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of
Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz
Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

Pursuant to 20 C.F.R. § 404.1520(a)(4)(i)-(v), the Commissioner
analyzes a claim in five steps:

1. Is the individual currently engaged in substantial gainful
   activity [SGA]?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet
   or equal those listed in Appendix 1 of 20 C.F.R. Part 404,
   Subpart P?

4. Does the individual have the RFC to perform work despite
   limitations and are there any impairments which prevent past

---

[6] In general, the legal standards applied are the same regardless of whether the
claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB
and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations herein should be
considered to refer to the appropriate parallel provision. The same applies to citations
of statutes or regulations found in quoted court decisions.

relevant work?[7]

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in

disapproval of the application for benefits.  A positive finding at step three

results in approval of the application for benefits.  At step four, the claimant

bears the burden of establishing a severe impairment that precludes the

performance of past relevant work.  Consideration is given to the

assessment of the claimant's RFC and the claimant's past relevant work.  If

the claimant can still do past relevant work, there will be a finding that the

---

[7]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R.
§ 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including
the claimant's description of her limitations, observations by treating and examining
physicians or other persons, and medical records.  *Id.*  Although an ALJ considers
medical source opinions, the responsibility for determining claimant's RFC lies with the
ALJ.  20 C.F.R. § 404.1546(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2,
1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's
finding about the ability of an individual to perform work-related activities.  The
assessment is based upon consideration of all relevant evidence in the case record,
including medical evidence and relevant nonmedical evidence, such as observations of
lay witnesses of an individual's apparent symptomatology, an individual's own
statement of what he or she is able or unable to do, and many other factors that could
help the adjudicator determine the most reasonable findings in light of all the
evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010)
(unpublished) (explaining claimant's RFC determination "is within the province of the
ALJ, not a doctor").  The Court will apply the SSR in effect when the ALJ rendered her
decision.  *See generally* Bagliere v. Colvin, No. 1:16CV109, 2017 U.S. Dist. LEXIS
8779, at *10-18, (M.D. N.C. Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS 51917
(M.D. N.C. Feb. 23, 2017).  For example, Dr. Gossinger's opinion that he did not think
Plaintiff was capable to engage in any work activities is entitled to no deference.
Tr. 609.  It is noted, however, that another treating physician, Dr. Black, observed
Plaintiff was able to function at a high level job.  Tr. 24, 530.

claimant is not disabled. If the claimant carries this burden, however, the

burden shifts to the Commissioner at step five to establish that despite the

claimant's impairments, the claimant is able to perform other work in the

national economy in light of the claimant's RFC, age, education, and work

experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224,

1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786

F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v). If the

Commissioner carries this burden, the claimant must prove that he or she

cannot perform the work suggested by the Commissioner. Hale v. Bowen,

831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all

of the medical opinions of the record resolving conflicts that might appear.

20 C.F.R. § 404.1527.[8]  When considering medical opinions, the following

factors apply for determining the weight to give to any medical opinion: (1)

the frequency of examination and the length, nature, extent of the treatment

relationship; (2) the evidence in support of the opinion, such as "[t]he more

a medical source presents relevant evidence to support an opinion,

particularly medical signs and laboratory findings, the more weight" that

---

[8]  This provision applies to claims filed before March 27, 2017. For claims filed after that date, section 404.1520c, titled "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017," applies.

opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). "This requires a relationship of both duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no

weight, and failure to do so is reversible error." MacGregor, 786 F.2d at
1053.

The ALJ may discount a treating physician's opinion report regarding
an inability to work if it is unsupported by objective medical evidence and is
wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir.
1991). Stated somewhat differently, the ALJ may discount the treating
physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804
F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the
opinion is "not bolstered by the evidence," the evidence "supports a
contrary finding," the opinion is "conclusory" or "so brief and conclusory that
it lacks persuasive weight," the opinion is "inconsistent with [the treating
physician's own medical records," the statement "contains no [supporting]
clinical data or information," the opinion "is unsubstantiated by any clinical
or laboratory findings," or the opinion "is not accompanied by objective
medical evidence." Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583
(citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). Where a
treating physician has merely made conclusory statements, the ALJ may
afford them such weight to the extent they are supported by clinical or
laboratory findings and are consistent with other evidence as to a

claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th
Cir. 1986).

Some opinions on issues such as whether the claimant is unable to
work, the claimant's RFC, and the application of vocational factors "are not
medical opinions, . . . but are, instead, opinions on issues reserved to the
Commissioner because they are administrative findings that are dispositive
of the case, *i.e.*, that would direct the determination or decision of
disability."  20 C.F.R. § 404.1527(d); *see* Bell v. Bowen, 796 F.2d 1350,
1353-54 (11th Cir. 1986). "[T]reating source opinions on issues reserved to
the Commissioner are never entitled to controlling weight or special
significance."  SSR 96-5p, 1996 SSR LEXIS 2, at *6 (1996).  Although
physician's opinions about what a claimant can do or the claimant's
restrictions are relevant evidence, such opinions are not determinative
because the ALJ has the responsibility of assessing the claimant's RFC.   A
treating physician's opinion that a claimant is unable to work and is
disabled would not be entitled to any special weight or deference.  The
regulations expressly exclude such a disability opinion from the definition of
a medical opinion because it is an issue reserved to the Commissioner,
and a medical source is not given "any special significance" with respect to
issues reserved to the Commissioner, such as disability.  20 C.F.R.

§ 404.1527(d)(1); SSR 96-5p, 1996 SSR LEXIS 2, at *6.  In <u>Lewis</u>, the

court noted "that we are concerned here with the doctors' evaluations of

[the claimant's] condition and the medical consequences thereof, not their

opinion of the legal consequences of his condition.  Our focus is on the

objective medical findings made by each doctor and their analysis based

on those medical findings."  125 F.3d at 1440.

Generally, more weight is given to the opinion of a specialist "about

medical issues related to his or her area of specialty than to the opinion of

a source who is not a specialist."  20 C.F.R. § 404.1527(c)(2), (5); *see also*

<u>Benecke v. Barnhart</u>, 369 F.3d 587, 594 n.4 (9th Cir. 2004) (noting that

opinions of specialists may be particularly important, and entitled to greater

weight than those of other physicians, with respect to a certain diseases

that are "poorly understood within much of the medical community");

<u>Somogy v. Comm'r of Soc. Sec.</u>, 366 F. App'x 56, 65 n.13 (11th Cir. 2010)

(unpublished) (same)).  Although a claimant may provide a statement

containing a treating physician's opinion of his or her remaining capabilities,

the ALJ must evaluate such a statement in light of the other evidence

presented and the ALJ must make the ultimate determination of disability.

20 C.F.R. §§ 404.1512, 404.1513, 404.1527, 404, 1545.

Further, when a claimant attempts to establish a disability based on his or her subjective complaints, he must provide evidence of an underlying medical condition in either objective medical evidence confirming the severity of the alleged symptoms or that the medical condition reasonably could be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a) and (b); Wilson, 284 F.3d at 1225-26.

A claimant bears the burden of proving he or she is disabled, and consequently, is responsible for producing evidence in support of the claim. *See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.

## IV. Legal Analysis

**Substantial evidence supports the ALJ's consideration of the evidence, including the medical opinions, and determination at step 5 of the sequential evaluation process that Plaintiff has the RFC to perform work in the national economy.**

### A.

Plaintiff challenges the ALJ's evaluation of the medical opinions in the record and asserts the ALJ should have afforded more weight to the opinions of his treating physicians, Michael D. Wyatt, M.D., Plaintiff's former pediatrician; Garrett D. Evans, Psy.D., a treating psychologist; and Gary T. Gossinger, M.D., a treating psychiatrist. ECF No. 15 at 24-28. Plaintiff also argues that the ALJ should have found that he was disabled at step 5 of the sequential evaluation process in light of the substantial

evidence from his treating psychiatrist and psychologist as well as the opinions of the state agency consultant psychologist that he cannot be present and function in the workplace eight hours a day, five days a week. ECF No. 15 at 24.

For example, Dr. Wyatt opined on April 23, 2009, that Plaintiff will require supervision and assistance from his parents well into his adult life and simple daily functions may be difficult or impossible for him.  Tr. 459. In December 2013, almost two years after Dr. Evans last saw Plaintiff, he opined Plaintiff will likely struggle with tasks that require sustained attention, memory, rapid cognition, and judgment.  Tr. 542.  Dr. Evans also stated he believed Plaintiff would struggle with a position that required social judgment or creative thinking.  *Id.*  In July 2015, Dr. Gossinger completed a mental residual functional capacity assessment wherein he opined Plaintiff was markedly or extremely restrictive in activities related to understanding and memory, sustain concentration and persistence, social interaction, and adaptation.  Tr. 606-08.  Dr. Gossinger also opined he did not think Plaintiff would be able to engage in work activities.  Tr. 609.

B.

The ALJ begins his discussion of Plaintiff's RFC with Plaintiff's allegations that include "the inability to work due to bipolar disorder, speech

and language impairment, and learning disabilities." Tr. 19. Plaintiff is 28

years old and "testified he has an AS degree in medical assisting, but he

did not pass the test to work in the field. The claimant will start school to be

a radiology technician next year. This program will take 2-3 years to

complete." *Id.*

The ALJ provided an extensive discussion of Plaintiff's hearing

testimony, including his activities of daily living. Tr. 19-20. The ALJ also

discussed Plaintiff's mother's testimony. Tr. 20. Using rather boilerplate

language, the ALJ determined that Plaintiff's "statements concerning the

intensity, persistence and limiting effects of these symptoms are not

entirely credible for the reasons explained in this decision." Tr. 20.

## C.

The ALJ reviewed Plaintiff's childhood records, which indicated he

participated in special education classes throughout school for language

impairments, attention deficit disorder, and behavioral concerns. Tr. 20.

Plaintiff had a full scale IQ score of 60 on the Wechsler Intelligence Scale

for Children-3rd Edition, when he was eight years old. "This placed him in

the mildly Mentally Deficient range of intellectual functioning." *Id.* The ALJ

noted that when administered the Stanford-Binet Intelligence Scale-4th

Edition three months later, his "composite score of 80 fell within the low

average range.  (Exhibit 1-F/72)."  *Id.*

Plaintiff graduated from high school in 2007 and "his IEP indicates he

was enrolled in 94 percent regular academic classes.  He continued to

receive occupational therapy one time per week for 30 minutes.  He also

received speech/language therapy two times per week for 30 minutes.

(Exhibit 9-F)."  Tr. 20.

## D.

In 2009, when Plaintiff was 22 years old, his former pediatrician,

Dr. Wyatt, indicated he

> has severe neurological processing deficits, which are consistent with
> severe learning disabilities.  He noted it is clear the claimant lags
> behind in adult cognition and will require supervision and assistance
> from his parents into his adult life.  Dr. Wyatt indicated the claimant is
> unable to make change, balance and account, tell time, self schedule,
> or drive in unfamiliar settings.  (Exhibit 1-F/163).

Tr. 20.

In August 2011, primary care physician, David J. Black, M.D.,

indicated Plaintiff was functioning at a high level with his job as well as

studying for a massage therapy license.  There were no particular signs of

ADHD and he was not on medication.  Tr. 21; *see* Tr. 529-30.

E.

## Gary T. Gossinger, M.D., and Garret Evans, Psy.D.

The ALJ provides an extensive analysis of the medical evidence

including the patient records for Drs. Gossinger and Evans.  This

discussion is interspersed with other medical evidence, but is provided

below in its entirety.

> The claimant began treatment with psychiatrist, Gary Gossinger, M.D., on January 12, 2012.  He described lifelong problems with impulsivity, learning difficulties, and mood.  He also reported a contentious relationship with his mother.  The claimant stated he had been unable to pass the licensing examination for massage therapy due to math questions.  He reported that he has a girlfriend. Although the claimant was working at Publix, he explained he has a trust fund and this money is administered by his mother, the trustee. Mental status examination revealed the claimant's insight was good, though his memory appeared to be impaired to some degree. Dr. Gossinger diagnosed organic brain syndrome.  He prescribed Remeron and recommended psychotherapy.  (Exhibit 3-F).
>
> On January 25, 2012, the claimant was voluntarily admitted to Shands Vista after uncontrollable anger outbursts, which led to him punching his brother in the face.  He was diagnosed with mood disorder vs. episodic dyscontrol.  The claimant was prescribed carbamazepine and Seroquel.  During hospitalization, the claimant's behavior and mood improved significantly.  The claimant interacted with other patients and participated in group therapy.  He was discharged on January 30, 2012.  (Exhibit 2-F).  Dr. Gossinger's follow-up records from March 27, 2012, indicate the claimant continued to report symptoms of depression.  (Exhibit 3-D).
>
> On May 11, 2012, Dr. Black noted the claimant was enrolled in a phlebotomy course at City College.  (Exhibit 4-F).  It appears the claimant did receive note taking and test accommodations from City College.  (Exhibit 3-F/14).  Dr. Gossinger's records from August

and September of 2012 are largely illegible. However, on March 27, 2013, it was noted the claimant needs to be on bipolar medications. When he returned in September of 2013, the claimant reported fatigue and memory problems. (Exhibit 11-F).

The claimant's treating psychologist from August of 2011 through January of 2012, Garret Evans, Psy.D., submitted a medical source statement on December 17, 2013. He noted the claimant displays learning and social problems as a result of his neuro-developmental delays. Dr. Evans indicated the claimant struggles with tasks that require sustained attention, memory, rapid cognition, and judgment. Although he can easily complete self-care tasks, he is not capable of living completely autonomously. The claimant will struggle in positions that require social judgment or interacting with many different types of people. Dr. Evans opined the claimant is able to work in positions that involve well-learned routines with an understanding supervisor. (Exhibit 5-F).

\*\*\*\*

In March and April of 2014, the claimant attended additional counseling sessions with Dr. Evans. He explained he felt suicidal in February after he sold his mother's ring to buy a new X-box. The claimant was also tearful and expressing feelings of social isolation. Dr. Evans encouraged the claimant to pursue community activities to reduce isolation. (Exhibit 8-F).

Dr. Grossinger's progress notes indicate the claimant cancelled his appointment in February of 2014. He advised the claimant that he needs to see someone to refill his medication. When the claimant's mother called on June 6, 2014 requesting a letter for more testing time, she was unaware that the claimant had not seen Dr. Grossinger since September of 2013. When the claimant returned to Dr. Grossinger on June 20, 2014, he reported he has difficulties taking his tests due to reading comprehension issues. The claimant also stated he was admitted under the Baker Act in February of 2014 with suicidal ideation. Dr. Grossinger indicated the claimant's judgment/impulsivity problem is due to attention deficit disorder. (Exhibit 11-F).

The claimant continued to request a letter for additional testing time on his Medical Assistant's examination in July of 2014. Dr. Evans referred the claimant for a neurological evaluation. (Exhibit 10-F). On September 11, 2014, Dr. Grossinger composed a letter requesting the claimant receive one and a half to twice the amount of additional time to take tests due to attention deficit disorder and a learning disability. When the claimant returned in December of 2014, he reported he was doing well. He stated he was studying medical assisting at City College. (Exhibit 11-F).

The claimant did not return to Dr. Grossinger until May 21, 2015. At that time, he stated he had been off his Seroquel due to insurance problems. During that time, he had been very temperamental. Dr. Grossinger restarted his medications. (Exhibit 11-F). The claimant returned to Dr. Grossinger for disability paper completion on July 7, 2015. Dr. Grossinger stated the claimant was very grandiose and delusional, thinking he would become a radiologist. He noted he had never observed this behavior in the claimant before, but the claimant had had [sic] not had his anti-psychotic medication due to insurance. Dr. Grossinger stated the claimant has had issues with mood since the beginning of treatment, yet his symptoms had not improved. He opined the claimant is not able to engage in any work activities, noting the claimant's symptom exacerbations will adversely affect any work capability. (Exhibit 13-F). Dr. Grossinger also completed a check form indicating the claimant has extreme limitations in completing a normal workday and workweek without psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. He also checked options indicating the claimant has marked limitations in understanding, remembering, and carrying out detailed and simple instructions. Dr. Grossinger also found the claimant has marked limitations in maintaining attention and concentration for extended periods, maintaining regular attendance, and sustaining an ordinary routine. Although the claimant will have marked limitations accepting instructions and responding appropriately to criticism, Dr. Grossinger found he only has moderate limitations on his ability to interact appropriately with the general public and get along with coworkers. (Exhibit 12-F).

Tr. 21-23.

### Diana M. Benton, Psy.D, and James Mendelson, Ph.D.

The ALJ made particular findings regarding Dr. Benton and Dr. Mendelson:

On February 20, 2014, the claimant presented to Diana Benton, Psy.D., for a consultative psychological evaluation on behalf of Disability Determination Services. At that time, he was a full-time student at City College. The claimant reported he has difficulties with anger, though he admitted he was learning how to control his anger with counseling. He further explained that he becomes angry when people repeat themselves to him or act like he is stupid. The claimant was fired from Publix when he was caught texting on the phone. He also admitted that he skipped a lot of days at work because of his girlfriend. The claimant stated he believes he can work and his wants to work, but does not have time currently due to school and caring for his dog. He stated that he lives in a condo that he owns. The claimant reported he is able to cook, clean, grocery shop, and drive. He admitted his mother handles his finances for him. The claimant stated he enjoys working out. The claimant also expressed a desire to become a medical assistant or phlebotomist. Mental status examination revealed his mood and affect were euthymic, though he stated he felt frustrated talking about his learning difficulties. Dr. Benton diagnosed mood disorder, learning disorder, and impulse control disorder. She opined the claimant's cognitive processing difficulties and deficits in impulse control may impact his ability to sustain social interaction during a work week. Finally, Dr. Benton opined the claimant may need special consideration in order to maintain employment in many work settings. (Exhibit 7- F) [Tr. 558-62].

On February 24, 2014, Disability Determination Services consultant, James Mendelson, Ph.D., opined the claimant has moderate limitations in social functioning and concentration, persistence, and pace. Dr. Mendelson opined although the claimant may have lapses in focus and reliable attendance, he remains capable of accomplishing simple, unskilled, repetitive tasks. The claimant may react ineffectively to the stress of customer service or frequent collaboration among employees. Therefore, he would benefit from

a work environment that de-emphasizes social interactions and keeps them to a superficial level. Dr. Mendelson opined the claimant is able to abide by the standards governing basic conduct in a vocational environment. (Exhibit 2-A) [Tr. 73-84]. John Thibodeau, Ph.D., agreed with Dr. Mendelson's conclusions. (Exhibit 6-A) [Tr. 117-22].

Tr. 21-22.

## F.

## The ALJ's Conclusions

The ALJ provided an extensive analysis of the Plaintiff's pre-hearing

statements and hearing testimony, his mother's hearing testimony and the

medical evidence, including the consultative evaluations. Tr. 23-25.

The undersigned notes that the claimant's pediatrician, psychologist, and psychiatrist have all indicated in one form or another that the claimant relies heavily on his mother for daily functioning and he will be unable to work a job to support himself (Exhibits 1-F/163, 5-F, 12-F, 13-F). While not dispositive, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. Although it is difficult to confirm the presence of such motives, they are more likely when the opinion in question is not consistent with treatment records. Dr. Wyatt's opinion is not accompanied by treatment records to support his conclusions. Furthermore, it is not consistent with his completion of college courses and current ability to live independently. Dr. Evans' opinion was given nearly two years after he last saw the claimant. Although there are subsequent treatment records from 2014 provided by Dr. Evans, the clinical findings do not support the level of impairment he suggested in his opinion. Dr. Grossinger's opinion

states the claimant's [sic] cannot work due to symptom exacerbations. However, his records indicate the claimant has not followed-up on a consistent basis and he has been noncompliant with his medications. There is little evidence of ongoing abnormalities documented on mental status examinations or other cognitive testing in Dr. Grossinger's treatment records. It was also noted the claimant was doing well when medication compliant. As for the extreme and marked limitations Dr. Grossinger endorsed on the mental residual functional capacity form, his progress notes document the claimant's enrollment in college courses, though he requires additional help. This is certainly consistent with an ability to perform unskilled tasks as well as an ability to interact appropriately with others. Furthermore, Ms. Wagner was unaware the claimant had not seen Dr. Grossinger in nearly 9 months, suggesting she does not in fact have the degree of day to day involvement in the claimant's daily functioning as indicated by his treating physicians. Overall, the undersigned gives less weight to the opinions of Dr. Wyatt, Dr. Evans, and Dr. Grossinger, as they are generally inconsistent with treating records and the claimant's current level of functioning.

The record does not contain evidence measuring the claimant's current intellectual functioning. However, he has been able to attend college classes successfully with extra test time. Dr. Black noted the claimant was functioning at a high level and there were no particular signs of ADHD even without medication. At the consultative psychological evaluation, the claimant was able to name presidents and oceans, though he had difficulties with performing serial sevens and simple multiplication. Although the undersigned finds the claimant is not completely precluded from performing all work activity, the record shows his impairments have decreased his mental ability to perform basic work activities. Therefore, the undersigned gives significant weight to the opinions and restrictions offered by the Disability Determination Services consultants, Dr. Mendelson and Dr. Thibodeau to reflect the claimant's work capabilities. Accordingly, the residual functional capacity has been restricted to simple, routine tasks. The undersigned finds the claimant is able to relate adequately to others, but will perform best in an environment that does not require extensive social interaction. Therefore, he has been limited to occasional, brief, superficial

interaction involving the public, coworkers, and supervisors. The undersigned also finds the claimant has some difficulties reacting to changes in the work setting and there should be no abrupt changes, only gradually introduced changes. Based on the claimant's testimony at the hearing, the undersigned further finds he has a poor ability to read, write, and use numbers.

In reaching this conclusion, the undersigned gives less weight to Dr. Benton's ultimate opinion that he may need special considerations to maintain long-term employment. This appears to be based primarily upon the claimant's statements regarding his inability to sustain employment, which are not fully credible. The undersigned notes the claimant testified he had difficulties working at Publix because he spent a great deal of time trying to calm himself and they did not like his hygiene. In contrast to this, the claimant admitted he skipped workdays to be with his girlfriend and he was caught texting on the phone. The claimant has not testified to difficulties maintaining his school schedule or attending classes. Additionally, it does not appear he has requested accommodations due to an inability to attend class. Although not dispositive, the undersigned cannot ignore statements in the record that the claimant has a trust fund and his mother pays the bills for his condo. This suggests he may not have had the financial need to work, again suggesting his continued unemployment is not solely the result of his impairments. This is further supported by his statements that he would like to work, but does not have time to do so due to his school schedule.

The claimant's testimony regarding his inability to work due to his mood, anger, and difficulties getting along with others is not entirely credible in light of the medical evidence of record. The claimant was admitted to Shands after fighting his brother, but there is no indication of altercations with others outside of his family. Although there is evidence of mood difficulties documented in Dr. Grossinger's progress notes, the claimant was not fully compliant with his medications and/or follow-up. It appears he is able to interact appropriately with others when so motivated. The undersigned observes that the claimant was appropriate and polite at the hearing, consistently using the word "sir" when responding to questioning. In addition, there is no indication he has difficulties

getting along with his classmates. He also completed a program for massage therapy, again suggesting a greater ability to interact with others than alleged.

The claimant and his mother's statements regarding the level of his dependence on her for daily functioning are not fully supported by the medical record. Ms. Wagner was unaware the claimant had not seen Dr. Grossinger in nearly 9 months, nor had his medications, suggesting she does not in fact have the degree of day to day involvement in the claimant's daily functioning as alleged. The claimant lives independently and engages in a variety of important community and domestic activities. He successfully attends college classes, spends time with friends going to karaoke, and cares for his dog. The claimant also reported an extensive workout regimen.

The undersigned agrees the claimant has some limitations on functioning due to his mental impairments. However, the medical evidence and his numerous activities of daily living do not support a conclusion he is mentally incapable of performing all work activity, including unskilled work. The residual functional capacity has been reduced to reflect his work capacity and remains with appropriate restrictions to compensate for his impairments.

Tr. 23-25; *see supra* at n.3.

### G.

The ALJ identified factors supported by the record for giving little weight to Dr. Wyatt's April 23, 2009, opinion. Tr. 23. Dr. Wyatt's opinion was not accompanied by treatment records to support his opinions. Tr. 23, 459. *See* 20 C.F.R. § 404.1527(c)(3). The ALJ also considered Dr. Wyatt's opinion that included statements that Plaintiff is dependent on his parent's help, which was not consistent with Plaintiff's completion of

college courses and his current ability to live alone.  Tr. 23, 38, 237, 512.

*See* Phillips, 357 F.3d at 1241 (upholding an ALJ's rejection of a treating physician's opinion where ALJ reasoned the opinion conflicted with the physician's treatment notes and the claimant's daily activities); *see also* Forrester v. Comm'r of Soc. Sec., 455 F. App'x 899, 901 (11th Cir. 2012) (unpublished) (interpreting Phillips to hold the ALJ does not need to give a treating physician's opinion considerable weight if evidence of Plaintiff's daily activities contradict the opinion).  (Although Plaintiff took special education courses in high school, the ALJ considered that he graduated from high school and had been enrolled in 94% regular academic classes "towards standard diploma.")  Tr. 20, 223, 585.

The ALJ also noted that Dr. Wyatt's opinion was generally inconsistent with Plaintiff's treatment records.  Tr. 23-24; *see* 20 C.F R. § 404.1527(c)(4).  In summarizing Plaintiff's treatment records, the ALJ noted Plaintiff's primary care physician, Dr. Black, opined on August 22, 2011, that Plaintiff was "functioning at a high-level with his job" and "studying for a massage therapy license."  Tr. 21, 24, 530.  Dr. Black also noted there were no signs of ADHD and with no medication, despite a history of ADHD.  *Id.*  The ALJ also discussed clinical findings from

Drs. Evans and Gossinger that did not support the level of impairment
suggested by their opinions.  Tr. 23, 512-13, 567-68, 588

Similarly, the ALJ identified appropriate factors supported by the record
for giving Dr. Evans' opinion little weight.  Tr. 23.  Dr. Evans' opinion was
given almost two years after he last saw Plaintiff on January 30, 2012.
Tr. 23, 542.  The ALJ noted that although Dr. Evans treated Plaintiff again
in 2014, Dr. Evans' clinical findings did not support the level of impairment
suggested in his opinion.  Tr. 23, 567-68, 588.  See 20 C.F.R.
§404.1527(c)(4); Phillips, 357 F.3d at 1241 (holding there is good cause to
discount an opinion that is not bolstered by other evidence in the record or
is inconsistent with the doctor's own records).  Of note are Dr. Evans'
clinical findings that Plaintiff was alert, oriented, cooperative, and had
logical, coherent thought process, despite several moderate/some
problems to the next level of current symptoms such as anger, stress
tolerance, poor self-esteem, and poor coping, although there was
improvement between April 1, 2014, and July 31, 2014.  Tr. 567-68, 588.

Furthermore, the ALJ identified appropriate factors supported by the
record for giving little weight to Dr. Gossinger's opinions.  Tr. 23.  The ALJ
noted that Plaintiff did not follow up with Dr. Gossinger on a consistent
basis and had been non-compliant with medication, in part, due to

insurance not paying for anti-psychotic medication.  Tr. 23, 589, 596, 599,

609.  The ALJ also observed that Dr. Gossinger's treatment records reflect

that Plaintiff did well when compliant with his medication.  Tr. 23, 592.  The

ALJ also reasoned that there was little evidence of ongoing abnormalities

documented on Plaintiff's mental status examinations or other cognitive

testing in Dr. Gossinger's treatment records.  Tr. 23, 512-13, 589, 592, 594-

97, 599-600.  *See* Phillips, 357 F.3d at 1241.  Further, the ALJ noted that

Dr. Gossinger's marked-to-extreme limitations on the mental RFC form,

was not consistent with Plaintiff's enrollment in college courses, although

he required additional help.  Tr. 23, 38, 529-30.  *See* Forrester, 455 F.

App'x at 901.  The ALJ observed that Plaintiff's ability to attend school was

consistent with an ability to perform unskilled tasks and interact

appropriately with others.  Tr. 23.

The ALJ acknowledged Plaintiff was hospitalized after a fight with his

brother, but also noted there was no indication of altercations with others

outside the family.  Tr. 24, 505.  The ALJ observed that Plaintiff appeared

able to interact with others appropriately when motivated.  Tr. 24.  For

example, the ALJ noted Plaintiff was appropriate and polite at the hearing

and there was no indication he had difficulties with his classmates.  Tr. 24,

37-58. *See* <u>Norris v. Heckler</u>, 760 F.2d 1154, 1158 (11th Cir. 1985)

(holding the ALJ can consider demeanor among other criteria).

Next, Plaintiff argues the treating physicians' conclusions are

supported by the consultative report by Dr. Benton. ECF No. 15 at 26-27.

This argument ignores the ALJ's assignment of little weight to Dr. Benton's

statements that Plaintiff's impairments "may" impact his ability to sustain

social interaction and he "may" need special consideration to maintain

employment in many work settings. Tr. 34, 558, 562. As a one-time

examiner, Dr. Benton's opinion was not entitled to special deference. *See*

20 C.F.R. § 404.1527(c)(2); <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d

1155, 1160 (11th Cir. 2004) (noting a one-time examiner's opinion is not

entitled to great weight).

The ALJ noted that Dr. Benton's ultimate opinion appeared to be

based on Plaintiff's statements regarding his inability to sustain

employment, which the ALJ found not fully credible, a credibility finding not

challenged by Plaintiff. Tr. 24. To this end, the ALJ noted that Plaintiff

testified that he had difficulties working at Publix because he spent a great

deal of time trying to calm himself and they did not like his hygiene, Tr. 43,

but stated to Dr. Benton that he was caught texting on the phone and

skipped work days to be with his girlfriend. Tr. 24, 560. The ALJ also

noted that Plaintiff did not testify to difficulties maintaining his school schedule or attending classes.  Tr. 24, 37-58.  In fact, Dr. Benton's examination includes several unremarkable findings, including euthymic mood, logical and goal-directed thought processes, adequate fund of information, "[n]o evidence of delusions or abnormal thought content," and fair judgment and insight.  Tr. 22, 24, 562; *see* Muniz v. Comm'r of Soc. Sec., No. 17-12100, slip op. at 7 (11th Cir. Nov. 27, 2017) (unpublished).  An ALJ may reject the opinion of an examining physician that is based on subjective complaints without significant clinical findings.  *See* Crawford, 363 F.3d at 1159-60 (upholding ALJ's determination to discredit the source's opinion because it was based primarily on subjective complaints unsupported by the medical evidence).

In summary, Plaintiff did not prove that the ALJ improperly evaluated the opinion evidence.  The ALJ stated with particularity the weight he gave the opinions of the medical sources and his reasons for doing so.  *See* Sharfarz v. Brown, 825 F.2d to 278, 279 (11th Cir. 1987).  The ALJ also considered their opinions in accordance with the requirements of 20 C.F.R. § 404.1527.  Tr. 18.  Although the ALJ did not expressly discuss each factor, "not every factor will apply in every case" and the ALJ is not required to expressly discuss every factor in his decision.  *See* Lawton v. Comm'r of

Soc. Sec., 431 F. App'x 830, 833 (11th Cir. 2011) (unpublished).  It has

been held that good cause exists for discounting opinions when the

opinions, as here, are unsupported and inconsistent with the evidence in

the record.  *See* Phillips, 357 F.3d at 1241.  Plaintiff has not demonstrated

that the ALJ overlooked material evidence, mischaracterized the evidence,

or improperly evaluated the medical opinion evidence in this record.[9]  Also,

substantial evidence supports the ALJ's RFC determination and conclusion

that Plaintiff can perform work in the national economy.  No error has been

shown.

## V.  Conclusion

Considering the record as a whole, the findings of the ALJ are based

upon substantial evidence in the record and the ALJ correctly applied the

law.  Accordingly, it is respectfully recommended that the decision of the

Commissioner to deny Plaintiff's applications for Social Security benefits be

**AFFIRMED** and judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on November 30, 2017.

**s/ Charles A. Stampelos_____**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

---

[9]  As noted by the Commissioner, ECF No. 16 at 14 n.9, Plaintiff discusses the "Grids" (Medical-Vocational Guidelines) and the expected work schedule for working on a regular and continuing basis.  ECF No. 15 at 14-24.  Plaintiff, however, does not relate this discussion to the facts of this case.

## <u>NOTICE TO THE PARTIES</u>

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**